IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ODELL SIMUEL,                          :

     Plaintiff,                        :

     vs.                               :

CITY OF DAYTON,                        :

     Defendant.                        :

Case No. 3:09cv180

JUDGE WALTER HERBERT RICE

---

**DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. #13); JUDGMENT TO ENTER IN
FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION
ENTRY**

---

The Plaintiff in this case was formerly employed with the Dayton Police

Department. She has sued her former employer, the City of Dayton, alleging that

its decision to terminate her employment violated several precepts of federal and

state law. The case is presently before the Court on Defendant's Motion for

Summary Judgment (Doc. #13), Plaintiff's Response (Doc. #14), Defendant's

Reply (Doc. #15), and the record as a whole. Before analyzing the parties'

arguments for and against the pending motion, the Court begins by briefly

recounting the factual and procedural background of the case, and, thereafter,

setting out the applicable standard to be applied on summary judgment.

Factual and Procedural Background[1]

Odell Simuel ("Plaintiff" or "Simuel") was formerly employed by the City of Dayton ("Defendant" or "the City"). In fact, Simuel had two separate periods of employment with the City, with the first beginning when she was hired in 1975, and ending with her retirement in 2006. Although she was continuously employed with Defendant throughout that time span, she worked in several different capacities, including with the Dayton Police Department's records section and the City prosecutor's office. Doc. #12-1 at 8–11 (Simuel Deposition). Starting in 1995, and continuing until her retirement in 2006, Plaintiff was employed as a radio information officer with the Dayton Police Department. Id. at 8–9.[2] On March 5, 2007, she came out of retirement to rejoin the police department in that same role. Doc. #2 at ¶3 (Plaintiff's Complaint). That period of employment ended on September 4, 2007, when Plaintiff was terminated. Doc. #12-1 at 51; Doc. #13-1 at ¶9 (Affidavit of Michael Shannon, Police Records Supervisor). On April 10, 2009, Plaintiff filed the lawsuit that is now before this Court, alleging that her termination was wrongful under several theories. Doc. #2.

―――――――――――

[1]Because this case comes before the Court on the Defendant's Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to said Motion in the manner most favorable to the Plaintiff, the party against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

[2]None of the papers filed by Plaintiff or Defendant identify the specific date upon which she was hired in 1975, or retired in 2006. However, they agree that more than a year had elapsed between the time she retired in 2006, and the time she was rehired on March, 5, 2007. That stipulation is sufficient for the present purpose of considering Defendant's motion for summary judgment.

According to Defendant, in the intervening period following Simuel's retirement in 2006, but before she was rehired in 2007, the State of Ohio conducted an audit of her department which resulted in significant changes in the manner that radio information officers performed job functions. Doc. #13-1 at ¶6. Defendant contends that Simuel had difficulty adapting to the new procedures, and that various issues in her job performance, including failing to properly input information into operator computers, failing to input information in a timely manner and frequently hanging up on outside entities, ultimately required that she be terminated. Id. at ¶7. However, the quality of Plaintiff's administration of her duties is not the primary focus of the parties' arguments on summary judgment. Rather, both parties focus on Plaintiff's status in her employment with the City, and her attendant right, or lack thereof, to procedural review of her termination.

The parties agree that, because more than one year had elapsed between her retirement and re-employment, Simuel rejoined the department on March 5, 2007, with the status of a "probationary" employee. Section 99 of the City's Charter provides as follows, regarding probationary employees:

Sec. 99. - Probation Period

An appointment or promotion shall not be deemed complete until a period of probation not to exceed six months has elapsed and a probationer may be discharged or reduced at any time within the said period of six months, upon the recommendation of the head of the department in which said probationer is employed, with the approval of the majority of the Board.

Doc. #13-7. For reasons that will become clear, Plaintiff's employment status at the time of her termination, that is, whether or not she was still a probationary

- 3 -

employee, is central to this case. Plaintiff contends that her six month probationary status had ended, and that she was a regular, non-probationary employee at the time of her termination. Defendant contends that the six month period had not yet expired, and that Plaintiff's status was still probationary. The Court analyzes the parties' arguments on this matter in the context of Plaintiff's three claims for relief, to wit: that Defendant violated her constitutional rights and is civilly liable for that conduct under 42 U.S.C. § 1983, that she was terminated in violation of clearly established public policy, and that she is entitled to relief under the equitable doctrine of promissory estoppel. Before turning to those issues, the Court briefly recounts the standard of review applicable to a motion for summary judgment.

Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions,

answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50).  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could

reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc.

v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v.

Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S.

832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment ....").  Thus, a court is entitled to rely, in determining whether a

genuine issue of material fact exists on a particular issue, only upon those portions

of the verified pleadings, depositions, answers to interrogatories and admissions on

file, together with any affidavits submitted, specifically called to its attention by

the parties.


Analysis

        The first claim of Simuel's Complaint alleges a deprivation of procedural due

process, pursuant to 42 U.S.C. §1983.  Plaintiff originally filed her lawsuit in the

Montgomery County Court of Common Pleas, see Doc. #2, and Defendant

removed to this Court on the ground that 28 U.S.C. §1331 conferred original

federal question jurisdiction as to Plaintiff's §1983 claim, see Doc. #1 (Notice of

Removal).  Accordingly, the Court begins by addressing Plaintiff's §1983 claim,

before considering her state law arguments, and any concomitant questions

concerning the exercise of supplemental jurisdiction over those claims.


Plaintiff's §1983 Action

        Plaintiff asserts that Defendant, acting under color of law, terminated her

from her position without the benefit of a hearing or other formal review, in

- 7 -

violation of her Fourteenth Amendment right to due process. Such conduct is made actionable in a suit for damages by 42 U.S.C. §1983. Johnston-Taylor v. Gannon, 907 F.2d 1577, 1581 (6th Cir. 1990). In order to prevail on this claim, Simuel must first establish that she enjoyed a property interest in her job as a radio officer. Lake Michigan College Fed'n of Teachers v. Lake Michigan Community College, 518 F.2d 1091, 1094 (6th Cir. 1975) ("The safeguards of procedural due process apply only when a person is deprived of liberty or property, and plaintiffs cannot prevail here unless their discharge implicated one of these protected interests."). The Sixth Circuit has held that "[g]overnment employment amounts to a protected property interest when the employee has a legitimate expectation of continued employment." Curby v. Archon, 216 F.3d 549, 553 (6th Cir. 2000). Since "property interests do not derive from the Constitution, but rather are created and defined by 'existing rules or understandings that stem from independent sources such as state law,'" Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)), the Court must consider the circumstances under Ohio law that may lead an employee to acquire property rights in a job. Ohio's courts have consistently held that a probationary employee does not have a legitimate expectation of continued employment. State ex rel. Krejci v. Civil Serv. Comm'n, 17 Ohio St.3d 140, 142, 478 N.E.2d 239, 241 (Ohio 1985) (appointment to a position of public employment is not intended to guarantee continued employment beyond the end of the probationary period); Walton v. Montgomery County Welfare

Dep't, 69 Ohio St.2d 58, 64–5; 430 N.E.2d 930, 935 (Ohio 1982) (Ohio

probationary public employees do not have a claim of entitlement to continued

employment).  Thus, public employees who are still on probationary status have

not established a property right in their employment to which the entitlements of

procedural due process attach.  Burns v. Greater Cleveland Regional Transit

Authority, 1991 U.S. App. LEXIS 30363 at *6 (6th Cir. 1991) (per curiam)

("Probationary public employees, therefore, are not entitled to the guarantees of

procedural due process before being dismissed.") (citing Walton v. Montgomery

County Welfare Dep't, 69 Ohio St. 2d 58, 60, 430 N.E.2d 930, 932 (Ohio 1982));

Dillon v. City of Macedonia, 43 Ohio App. 3d 17, 19, 538 N.E.2d 1085, 1087

(Ohio Ct. App. 1988) ("The decision of an appointing authority made during a

probationary civil servant's employment is final and not subject to administrative or

judicial review."); Hill v. Gatz, 63 Ohio App. 2d 170, 410 N.E.2d 1268 (Ohio Ct.

App. 1979) (same) (syllabus).

Because the City's Charter indicates that workers are considered

"probationary employees" for up to six months after they are first hired, the

resolution of this case turns primarily on the construction to be applied in

interpreting the six month time frame reflected in that document.  Plaintiff was

rehired as a radio operator on March 5, 2009, and was terminated from that

position on September 4, 2009.  She contends that the six month time period

should be calculated as one hundred and eighty (180) days from the starting date

of her re-employment.  Using that metric, Plaintiff claims that her probationary

period ended on or about September 1, 2009, and, that, as of that date, she was no longer a probationary employee and was entitled to a hearing before being dismissed. Conversely, Defendant contends that the six month period should be calculated in terms of calendar months, without reference to the number of days in any particular month used in the calculation. For example, by Defendant's metric, a one month period that begins on January 1st of a given year, would end on February 1st of the same year, just as a period that begins on February 1st would end on the first day of March, irrespective of the fact that there are more days in January than in February. Thus, if Defendant's approach is used, Plaintiff's probationary period was set to expire on September 5, 2007, and her termination on September 4, was still within the probationary time period. The Court must now consider which method of calculation is appropriate in measuring the "six month" time period identified in the Charter.

The greater weight of authority supports Defendant's interpretation. For example, in In re Ionosphere Clubs, Inc., 111 B.R. 436 (Bankr. S.D.N.Y. 1990), the bankruptcy court addressed a similar issue in the context of a contract under Massachusetts law, which allowed a lessee to renew his lease within a certain number of months. Based on a detailed analysis, the court concluded that the ordinary meaning of "month" is a calendar month, not a period of 30 days.

> The common everyday meaning of the term "month" is a calendar month. See, Black's Law Dictionary at 908 (5th ed. 1979) ("Word 'month', unless otherwise defined, means 'calendar month', or time from any day of any of the months as adjudged in the calendar to corresponding day, if any, if not any, to last day, of next month."); Berkshire Gas Co. v. Board of Assessors, 361 Mass. 873, 281 N.E.2d 602 (1972) (when notice of refusal of tax

10

abatement was received on October 6, 1970, three month period for filing appeal expired on January 6, 1971 and therefore appeal filed January 7, 1971 was untimely); Boston Penny Savings Bank v. Assessors of Boston, 314 Mass. 599, 600, 51 N.E.2d 1, 2 (1943) (the term "month" means calendar month for purposes of calculating the 4 month period within which tax assessor had to act as distinguished from the 90 day period within which the taxpayer had to appeal the assessor's decision).

In discussing the computation of time under Federal Rule 6, Moore's states:

> If the prescribed period of time is designated in months, the word "month" means calendar month and not a *lunar* month of 28 days, in the absence of a statute prescribing a different definition.

2 Moore's Federal Practice para. 6.04 (2d ed. 1985) (Emphasis in original) (Citing Guaranty Trust & Safe Deposit Co. v. Green Cove Springs & Melrose R. Co., 139 U.S. 137 (1891)). See, Siegelschiffer v. Penn Mutual Life Ins. Co., 248 F. 226, 227 (2d Cir. 1917).

Id. at 442.

A more recent version of Moore's provides the following additional

discussion:

> "Month" means a calendar month.  Thus, whether the month in question is 28, 29, 30 or 31 days long, a one-month time period that begins on February 15 will end on March 15, in a leap year or in a regular year. Similarly, "year" means a calendar year.  Therefore, whether the year in question is a regular year or a leap year does not matter for computational purposes.

2 Moore's Federal Practice § 6.04 (3d ed. 2009).  Furthermore, while the Court's

research has not revealed any case law from Ohio's state courts directly

addressing the present issue, in two unpublished decisions, the Sixth Circuit has

held that a written provision that provides for a six month time period should be

measured in terms of calendar months, not 180 days.  In Abou-Sakher v. Garvey,

2000 U.S. App. LEXIS 31578 (6th Cir. 2000) the court concluded that a "six

month" time period in a federal regulatory stale complaint rule should be measured with calendar months, not 180 days:

> The "stale complaint" rule does not call for dismissal of a complaint that states allegations of offenses more than 180 days old; it calls for dismissal of complaints alleging violations more than *six months* old. See 49 C.F.R. § 821.33; Thunderbird Propellers, Inc. v. FAA, 191 F.3d 1290, 1294 (10th Cir. 1999). The FAA's complaint was served on Abou-Sakher on March 18, 1998, 182 days after the September 18, 1997, incident. However, because the six-month period began on September 19, 1997, the day after the violation, see 49 C.F.R. § 821.10, it ended on March 18, 1998, the day Abou-Sakher received notice, and so the complaint was timely in this case.

Id. at *6 (emphasis in original). Similarly, applying Ohio law in Burns, supra, the court rejected as contrary to the plain language of an employment contract, a party's argument that a six month probationary employment period should be interpreted as 180 days, in light of his office's customary practices:

> Burns alternatively contends that there is a genuine issue of fact on the question whether the six-month period was actually 180 days. In support, he relies upon an affidavit of a former personnel director concerning past practices. This does not raise a question of fact because it is contrary to a clear interpretation of the written terms of the employment contract in force during the probationary period of Burns, which includes May 25, 1990.

Burns, 1991 U.S. App. LEXIS 30363 at *8 (concluding that a six month probationary period that began on November 26, 1989 continued until at least May 25, 1990). Taken together, these materials persuasively indicate that the "six month" language that is pertinent in this case should be interpreted as six calendar months.

Plaintiff does not cite any Ohio or federal case law to support her interpretation, that "six months" should be taken to mean 180 days. Instead she

presents two arguments that either analogize the relevant clause in the Charter to a different contract (her contract with her union), or advance policy justifications for preferring the 180 days interpretation. Plaintiff first argues that a provision in the master contract of the Dayton Public Services Union supports the 180 day construction, indicating that the relevant provision in that contract provides as follows:

> All employees in the bargaining units defined herein who, one hundred and eighty days from the date of hire are not members in good standing of the union, are required to pay the union a fair-share fee as a condition of employment and as permitted by the provisions of section 4117.09 C [sic] of the Ohio revised code [sic].[3]

Doc. #14 at 5. Although the cited paragraph clearly addresses fees owed by non-union employees who benefit from the efforts of the employees' union, Plaintiff suggests that one who had read both the quoted provision as well as the City's Charter, might reasonably understand the language referring to "six months" in the latter to mean 180 days. The Court finds this reasoning unpersuasive. Simply put, these are two different documents, governing two different relationships. There is no reason that one should conclude that the 180 day language in a particular clause addressing the relationship between public employees and their union would

---

[3]Plaintiff's Response cites this paragraph as being contained in Exhibit 3 of the "McKenzie Deposition." However, the docket in this case does not contain any depositions other than Plaintiff's own (Doc. #12-1), and the only testimony in the record from the Police Records Supervisor, Brent McKenzie, is his affidavit, Doc. #13-2, which Defendant filed with its summary judgment motion. Regardless, the Court has considered the argument to which the aforementioned citation relates, but concludes that it does not support Plaintiff's attempts to defeat summary judgment.

have any bearing on the City's Charter or other separate agreement between it and its employees generally. If anything, the fact that these two documents speak in terms of two different time periods undermines Plaintiff's argument, rather than supporting it, because it highlights the fact that the City's drafters herein could have referred to 180 days, rather than six months, had they desired to do so.

Second, Plaintiff argues that failing to interpret six months as 180 days creates an arbitrary standard which would cause City administrators to simply "decide for themselves" whether an employee has a justiciable property right in continued employment. Doc. #14 at 6. The Court cannot agree. The parties' competing interpretations of the probationary period do not present a choice between a standard that is arbitrary and unclear on the one hand, and one that is rational and fair on the other. Rather, as illustrated above, interpreting "six months" to mean six calendar months has a consistent and comprehensible meaning: the running of a given time period falls on the identical anniversary date six months after the first day that starts the running of the time period. See Moore at §6.04[1][a]. This calculation produces a result that is adverse to the Plaintiff in this particular case, but not because it is subject to the unfettered discretion of City administrators. The terms of Plaintiff's agreement with her employer allowed her to be considered a probationary employee for up to six months after she was first hired, and indeed, she retained that status until her termination. Because Ohio law does not recognize a probationary employee's right to a hearing or other review prior to termination, her §1983 claim is untenable.

- 14 -

Accordingly, Defendant's Motion for Summary Judgment is sustained as to Plaintiff's §1983 claim.


Remaining State Claims

The remaining claims in this suit are for wrongful termination and promissory estoppel, both of which are based on Ohio law. Plaintiff initially filed this suit in the Court of Common Pleas, in Montgomery County, and Defendant removed it because his §1983 claim vested original federal question jurisdiction in this Court. See Doc. #1 (Defendant's Notice of Removal). The Court must now consider whether to continue to exercise supplemental jurisdiction over the remaining state law claims.

The supplemental jurisdiction statute, 28 U.S.C. §1367, is a codification of United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6th Cir. 2010). It allows a federal district court to exercise jurisdiction over non-federal causes of action "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. §1367(a). In the instant case, Defendant did not specifically invoke this Court's supplemental jurisdiction in its Notice of Removal, or elsewhere in the record. However, both parties have clearly operated under the assumption that the Court would exercise supplemental jurisdiction over the Plaintiff's state law claims, as they have fully briefed and argued those issues throughout their summary judgment memoranda. Although the parties simply

proceed as if the exercise of supplemental jurisdiction is appropriate, a federal court has an independent duty to examine its own subject matter jurisdiction. Amazon, Inc. v. Dirt Camp, Inc., 273 F.3d 1271, 1274 (10th Cir. 2001). Thus, the Court first considers whether the exercise of supplemental jurisdiction over the remaining state law claims is appropriate, especially in light of its decision to grant summary judgment on Plaintiff's only federal cause of action.

It is clear that the remaining claims are "part of the same case or controversy," 28 U.S.C. §1367(a), because they both address the same issue as Plaintiff's §1983 claim, to wit: the termination of her employment as a radio operator. However, once all claims conferring original federal question jurisdiction have been dismissed, it remains within a district court's discretion whether to continue to exercise supplemental jurisdiction over remaining state law claims that arise from the same nucleus of operative facts as those conferring jurisdiction, or to dismiss the remaining claims without prejudice, allowing the plaintiff to refile in state court. Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1412 (6th Cir. 1991); see also 28 U.S.C. §1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim [if] the district court has dismissed all claims over which it has original jurisdiction."). In deciding whether to continue to exercise supplemental jurisdiction, the Court must balance concerns of federalism and comity, on the one hand, generally weighing against unnecessary federal court decisions addressing state law, and the common sense policies of judicial economy and fairness on the other. Gamel, 625 F.3d at 952. Because the

claims that remain are basically derivative of the same time frame issues the Court

has just discussed, pertaining to Plaintiff's §1983 action, the Court concludes that

it is appropriate to decide them here, rather than subject the parties to the

additional delay and expense of refiling and relitigating these matters in state court.

As the Sixth Circuit concluded in Aschinger v. Columbus Showcase Co., 934 F.2d

1402 (6th Cir. 1991), where state law questions will be resolved by the same

predicate factual and legal issues that resolved the federal cause of action, it may

be appropriate for a court to exercise its discretion and resolve all issues in the

same judicial proceeding. Id. at 1412 (citing Province v. Cleveland Press Pub. Co.,

787 F.2d 1047, 1055 (6th Cir. 1986)).

 The Court now turns to Plaintiff's state law claims.


Promissory Estoppel

 Promissory estoppel is derived from the common law, and contains the

following elements:

> (1) conduct or language amounting to a representation of material facts; (2)
> the party to be estopped must be aware of the true facts; (3) the party to be
> estopped must intend that the representation be acted on or act such that
> the party asserting the estoppel has a right to believe it so intended; (4) the
> party asserting the estoppel must be unaware of the true facts; and (5) the
> party asserting the estoppel must detrimentally and justifiably rely on the
> representation.

Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1217 (6th Cir. 1987) (applying

Ohio law) (citing Acri v. International Association of Machinists, 781 F.2d 1393,

1398 (9th Cir. 1986)).

Resolving this issue does not require the Court to examine each of the foregoing elements in detail. Simuel has admitted that no one associated with the Defendant made any direct representations to her that her probationary period would be measured as 180 days, rather than six months, or at any time indicated that she was no longer operating on probationary status. See Doc. #12-1 at 69 (Plaintiff's Deposition). Instead, as her Response makes clear, the only "reliance" that she experienced was derived from the "cited provisions [of] the City Charter... that after her probationary period ended, she would not be removed from her position without cause and an opportunity to be heard." Doc. #14 at 9. However, this argument simply begs the question already addressed, concerning when Plaintiff's probationary period was set to end. As the Court has concluded, the only representation that Simuel could have reasonably relied upon was that her probationary period would, consistent with the language of the City's Charter, last for six months, not necessarily 180 days, as she now interprets it. Because the six month probationary period was not set to expire until after Simuel was actually terminated, her claim for promissory estoppel is unfounded at the most basic level.

Accordingly, Defendant's Motion for Summary Judgment is sustained as to Plaintiff's promissory estoppel claim.


Wrongful Termination in Violation of Public Policy

The final count identified in Plaintiff's Complaint is for wrongful discharge in violation of public policy. Doc. #2 at 3. The Ohio Supreme Court has indicated

-18-

that the tort of wrongful discharge in violation of public policy consists of the

following four elements:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

Leininger v. Pioneer Nat'l Latex, 115 Ohio St. 3d 311, 313, 875 N.E.2d 36, 39

(Ohio 2007).

      In order to prevail on the claim now under scrutiny, it is axiomatic that

Simuel must identify a particular public policy, recognized by Ohio law, that was or

will be diminished because of her termination.  Balding-Margolis v. Cleveland

Arcade, 352 Fed. Appx. 35, 46 (6th Cir. 2009) ("The Ohio Supreme Court has

held that an exception to the employment-at-will doctrine is justified where an

employer has discharged his employee in contravention of a sufficiently clear public

policy.") (citing Painter v. Graley, 70 Ohio St. 3d 377, 383, 639 N.E.2d 51, 56

(Ohio 1994)).  Plaintiff identifies two sources of public policy which she believes

were contravened by her termination, to wit: Article XV §10 of Ohio's State

Constitution and §124.322 of the Ohio Revised Code.  The Court addresses each

in turn.

      Section 10 of Article XV of the Ohio Constitution provides as follows:

> Appointments and promotions in the civil service of the state, the several counties, and cities, shall be made according to merit and fitness, to be ascertained, as far as practicable, by competitive examinations. Laws shall be passed providing for the enforcement of this provision.

Plaintiff asserts that the foregoing evinces a clear public policy "in favor of retaining qualified, experienced personnel in the civil service and of discharging only those lacking in merit," but does not elucidate this interpretation by referring to any Ohio case law holding that a termination violated public policies established in Article XV. Doc. #14 at 9. Furthermore, the only mechanism that Plaintiff has suggested is implicated by Defendant's actions in this case is its failure to provide her with an administrative hearing or other review of her termination. This suggestion is at odds with the position of Ohio's courts, which, as this Court has already explained, have consistently held that a probationary employee may be terminated without a hearing. E.g., Burns, 1991 U.S. App. LEXIS 30363 at *8; City of Macedonia, 43 Ohio App. 3d at 19. Plaintiff's unsupported reading of Article XV is foreclosed by relevant federal and state case law.

Section 124.322 of the Revised Code is also inapplicable. That provision sets forth procedures for Ohio agencies to follow when conducting a "reduction in force," which is, in other words, a significant number of layoffs as a component of a departmental reorganization. That is not what happened in this case, and Plaintiff's memorandum does not present any colorable argument as to how that provision is implicated by her termination.

Accordingly, Defendant's Motion for Summary Judgment is sustained as to Plaintiff's claim for wrongful discharge in violation of public policy.

Writ of Mandamus

Finally Plaintiff purports to identify a count in her Complaint titled "Writ of Mandamus," under which she asks that the Court order her reinstatement to her former position.  See Doc. #2 at 4.  Technically speaking, a writ of mandamus is not itself an independent cause of action, but rather, a procedural remedy by which a court orders some other entity to do or forbear from doing some specific act, as required by law.  In any event, because Plaintiff has failed to demonstrate that a genuine issue of fact is present as to any of the above claims, it is appropriate for the Court to deny her request for mandamus.


Conclusion

As a result of the Court's rulings herein, the Defendant's Motion for Summary Judgment (Doc. #13) is sustained, in its entirety.  Judgment will be entered in favor of the Defendant and against the Plaintiff.


The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.


September 12, 2011

_____
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.